UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
JOHN P. CHARTERS, individually and on :
behalf of all others similarly situated, :
: NO. _____
Plaintiff, :
v. :
:
JOHN HANCOCK LIFE INSURANCE :
COMPANY (U.S.A.), : **CLASS ACTION COMPLAINT**
:
Defendant. :
_____ :
:

Plaintiff, John P. Charters, individually and on behalf of a class of all others similarly situated, by its attorneys, alleges the following for his Complaint against Defendant John Hancock Life Insurance Company (U.S.A.) ("Hancock" or "Defendant"):

### I. NATURE OF THE ACTION AND SUMMARY OF CLAIMS

1. Plaintiff is the trustee of the Charters, Heck, O'Donnell & Petrulis, P.C. 401(k) ("Plan"). Plaintiff, as trustee of the Plan, purchased an Accumulated Retirement Account Group Annuity Contract ("Contract") from Defendant in April of 2005. Plaintiff brings this action pursuant to § 502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2) and (3), on behalf of the Plan and all trustees, sponsors and administrators of all "employee benefit plans" under ERISA, 29 U.S.C. § 1002(1), that owned variable annuity contracts from Defendant (the "Class").

2. As more fully set forth below, Defendant is a fiduciary of the Plan pursuant to ERISA, and as such has a duty not to charge excessive fees for its services or to engage in prohibited transactions. These duties are set forth in ERISA §§ 404 and 406, 29 U.S.C. §§ 1104

and 1106, and in Department of Labor Regulations, 29 C.F.R. § 2550.  As set forth below, Defendant breached these duties by charging improper and excessive fees, and by improperly accepting, for its own benefit, revenue sharing payments from third party mutual funds which were paid from assets held for the benefit of the Plan.  As a result of these breaches, Defendant was overpaid for services rendered under the Contract, and the Plan's assets were diminished by the amount of the overcharges and payments, and the income those overcharges and payments would have earned had they been properly credited to the Plan's Account.  Plaintiff seeks damages and equitable relief on behalf of the Class.

## II.  JURISDICTION AND VENUE

3. Plaintiff's claims arise under and pursuant to ERISA § 502, 29 USC § 1132.

4. This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1331.

5. Venue is proper in this District because Defendant's principal place of business, and the location of its headquarters, is in Boston, Massachusetts.

## III.  THE PARTIES

6. Plaintiff John P. Charters is a principal of Charters, Heck, O'Donnell & Petrulis, P.C., and a resident of Michigan.

7. Defendant, John Hancock Life Insurance Company (U.S.A.), is a Massachusetts Corporation with its principal place of business in Boston, Massachusetts.

## IV. SUBSTANTIVE ALLEGATIONS

*Description of the Plan*

8.     The Plan is an Employee Benefit Plan within the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. § 1002(3) and 1002(2)(A). The purpose of the Plan is to provide retirement benefits to Plan Participants.

9.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). The Plan provides individual accounts for each Participant and pays benefits to each Participant based solely upon the amount of money in his or her individual account. Thus, the amount of benefits received by each Participant in the Plan is not set by contract (as it is in a "defined benefit" plan), but rather, depends upon the amount of money invested in the Participant's account, the performance of the accounts' investments, and – critically – the fees charged by the companies who manage the money. The Plan is a typical 401(k) retirement plan similar to those offered by employers throughout the country.

*Description of the Contract*

10.    The Contract between Plaintiff and Defendant became effective on May 31, 2005.

11.    The Contract provides that Defendant will hold and manage assets paid by the Plan to Defendant ("Assets") in an account maintained by Defendant, which is segregated from Defendants' general funds (the "Separate Account").

12.    The Contract provides that Defendant does not hold the assets in trust for the benefit of the Plan but rather "owns" the Assets in the Separate Account.The Contract also requires that Defendant maintain sufficient assets in the Separate Account to pay Defendants'

contractual obligations to the Plan. The Separate Account is a bookkeeping entry in Defendant's books and records.

13. The Contract requires Defendant to invest the Assets and credit or charge any income, gains or losses from investment of the Assets held and managed by Defendant in the Separate Account to the Separate Account, but provides that the Separate Account is not chargeable with liabilities arising out of Defendants' other business.

14. Defendant is required to record and maintain accounts showing each Participant's contributions to the Plan, the investment of those contributions and the fees, gains and losses associated with those investments. These records are referred to as "Participant Accounts." The Participant Accounts are merely bookkeeping entries within the Separate Account.

15. Subject to the terms of the Contract and a penalty of up to 2% under certain circumstances, the Plan has the contractual right to be paid by Defendant the value of the Assets allocated to the Separate Account.

16. Subject to the terms of the Contract and a surrender fee of up to 2% in certain circumstances, the Plan also has the contractual right, on behalf of any Participant or beneficiary, to be paid by Defendant the value of the Assets allocated to the Participant's Account.

*Investment Options Pursuant to the Contract*

17. Defendant established and maintained a variety of investment options pursuant to the Contract, including a Guaranteed Interest Account (which is a fixed income investment account) and a variety of mutual fund investment options.

18. The Contract provides that Defendant has the right, in its sole discretion, to substitute alternative mutual funds, trusts or portfolios for the mutual funds it offers.

19. The proportion of the Separate Account allocated to each investment option is determined by Plan Participants, subject to certain restrictions discussed below.

20. To invest Assets in a mutual fund, a Plan Participant selects the mutual fund into which he wants the Assets in his Participant Account invested.

21. The Contract permits the Plan to change the amount of Assets invested in the mutual funds through inter-account transfers.

22. To limit transaction costs incurred by Defendant in performance of the Contract, the Contract permits Defendant to impose a transfer charge upon three months advance notice for inter-account transfers in addition to any fees or charges imposed by the mutual funds.

23. The Contract also permits Defendant to restrict trading among the mutual funds to further limit transaction costs.

*Defendant's Pooling of Assets*

24. Defendant offers the mutual funds through so-called "Sub-accounts," which are bookkeeping records established and maintained by Defendant to account for investment in the mutual funds.

25. A Sub-account is maintained for each mutual fund offered by Defendant under the Contract.

26. As part of its recordkeeping duties, Defendant allocates Assets in the Participant Accounts to the particular Sub-account that invests in the corresponding mutual fund.

27. Upon information and belief, and consistent with industry practice, Defendant permits other plans that are members of the Class to allocate assets to the same Sub-accounts available to the Plan.

28.     All assets invested by all Separate and Participant Accounts established and maintained by Defendant pursuant to variable annuity contracts in a particular mutual fund are accounted for and pooled in a single Sub-account.

29.     Defendant buys shares of a mutual fund in its own name with its own assets in an amount equal to the value of the total amount pooled in the respective Sub-account. Defendant records an amount for the mutual fund shares it owns in the Sub-account.

30.     Separate and Participant Account "interests" in the mutual fund are accounted for as bookkeeping entries, which show "units" of interest in the Sub-account. The Separate and Participant Accounts do not actually own shares of the mutual fund.

31.     Defendant invests on an aggregate basis all of the asset allocations accounted for in a Sub-account. For example, if Participant A instructs Defendant to "buy" $150 worth of XYZ Mutual Fund, and Participant B instructs Defendant to "sell" $100 of the same fund, Defendant makes inter-account bookkeeping adjustments to credit Participant A's account for $100 worth of "units" of the Sub-Account invested in XYZ Mutual Fund, and debits Participant B's account for $100 worth of that Sub-account's units. Defendant then purchases $50 worth of shares of the mutual fund in its own name, and credits $50 to the XYZ Mutual Fund Sub-account and to Participant A's Participant Account. Only after netting the "purchase" and "sale" instructions of all of the Separate and Participant Accounts allocated to a particular Sub-Account does Defendant actually purchase or sell shares of the mutual fund. Upon information and belief, Defendant engages in only one such transaction per day with each mutual fund.

*Fees and Charges for Defendant's Services*

32. The Contract permits Defendant to charge both a fixed Participant fee and an asset charge based on the amount of Assets held in the Separate Account. The Contract contains a fee schedule for both Participant Fees and Asset Charges. The charges compensate Defendant for performing recordkeeping services, such as creating the Separate and Participant Accounts, allocating contributions to these accounts, accounting for transfers to and from these accounts, and accounting for gains, losses and charges concerning these accounts, as well as preparing confirmations of transfers in these accounts and periodic statements of the value of these accounts.

33. Participants are also subject to an additional annual investment charge for investment in each Sub-account, comprised of the fee charged by the underlying mutual fund for managing the Sub-account's mutual fund investment and an "administrative maintenance charge" levied by Defendant.

34. The purpose of the "administrative maintenance charge" is to compensate Defendant for administering and maintaining each particular Sub-account.

35. The "administrative maintenance charge" could be as high as 50 to 75 basis points per dollar invested in each Sub-account.

36. Defendant accounts for all contributions, investment allocations, transfers, gains, losses and charges concerning Separate and Participant Account investments in the Guaranteed Interest Account and the Sub-accounts as part of its regular duties under the Contract for which it is paid the Participant Fee and the Asset Fee.

37. Defendant charges no "administrative maintenance charge" with respect to investments in the Guaranteed Interest Account even though Defendant actually invests the assets allocated to that account rather than merely purchases shares of a mutual fund managed by others.

38. Upon information and belief, the only administration or maintenance Defendant performs with respect to the Sub-accounts, as opposed to managing, maintaining and keeping records for the Separate and Participant Accounts generally, is purchasing mutual fund shares.

39. Because Defendant does virtually no work in exchange for the administrative maintenance charge, the charge is excessive in relation to the work performed. The administrative service charge, which is calculated as a percentage of assets, bears no relationship to the cost of providing services to the Plan or the Plan Participants.

*Revenue Sharing Payments from Mutual Funds*

40. The Contract provides that the annual "administrative maintenance charge" may be reduced by the amount, if any, that Defendant or its affiliates receive from the underlying mutual fund companies in the form of revenue sharing payments ("Revenue Sharing Payments").

41. Upon information and belief, Defendant consistently receives the Revenue Sharing Payments from the underlying mutual funds.

42. Upon information and belief, Defendant received Revenue Sharing Payments in excess of the amount by which it reduced the administrative maintenance fee or in excess of the entire administrative maintenance fee authorized by the Contract.

43. Since Defendant is fully compensated for the work it performs under the Contract through the Participant Fees and Asset Charges, any Revenue Sharing Payments paid to Defendant by mutual fund companies for investment of Plan Assets should have inured to the benefit of the Plan and not to the benefit of Defendant.

*Defendant's Fiduciary Status and Duties Under ERISA*

44. ERISA defines a "fiduciary" as anyone who exercises authority or control over the management or disposition of Plan Assets. 29 U.S.C. §1002(21)(a).

45. Defendant exercised authority or control over the management or disposition of Plan assets. First, Defendant controls which mutual funds are available as investment options for the Plan and its participants. Second, Defendant uses its custody or control over the mutual funds to obtain revenue sharing payments from mutual fund advisors. Finally, Defendants are fidicuries by virtue of all the actions it can and does take pursuant to the Contract. Specifically, the asset of the Plan is a right to payment from Defendant in an amount equal to the value of the Assets, net of any gains, losses and charges. Defendant had authority or control over the management or disposition of this payment and the investments, which affected the value of the payment. For example, Defendant accepted and owned Plan contributions, managed the Separate and Participant Accounts, selected the investment options in which the Accounts were permitted to invest, negotiated with mutual fund companies the terms pursuant to which the funds would be included as investment options and purchased and sold mutual fund shares the performance of which determined the amount of the payment. Accordingly, Defendant is a fiduciary under ERISA.

46. Defendant is also a fiduciary as to the Revenue Sharing Payments. The Revenue Sharing Payments themselves constitute Assets in Defendants hands because, (a) Defendant received the Revenue Sharing Payments as a result of its fiduciary status or function (i.e., because Defendant receives payments from mutual funds in exchange for offering the funds as an investment options under the Plans) and (b) the Revenue Sharing Payments were made by the mutual fund advisors and received by Defendants at the expense of the Plan and its participants

(because the mutual fund set the fees they charged the Plan and its participants to cover not only the fees they would normally have charged, but also the amount of the Revenue Sharing Payments they make to Defendant). Defendant is therefore a fiduciary with respect to the Revenue Sharing Payments because it exercises authority or control respecting their management or disposition by arranging for, accepting and retaining them.

47. ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ."

48. The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

49. ERISA § 406 (b)(1) also prohibits a fiduciary from dealing with assets of a plan for its own interest or account. 29 U.S.C. § 406 (b)(1).

## V. CLASS ACTION ALLEGATIONS

50. Plaintiff brings this action in part as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all trustees, sponsors and administrators of all "employee benefit plans" under ERISA, 29 U.S.C. § 1002(1), that owned variable annuity contracts from Defendant..

51. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands

of members of the Class. The number and identity of class members could easily be determined from the books and records of Defendant.

52. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)    whether Defendant was a fiduciary of the plans;

    (b)    whether Defendants breached its fiduciary duties by receiving excessive compensation;

    (c)    whether the plans were injured by such breaches; and

    (d)    whether the Class is entitled to damages and injunctive relief.

53. Plaintiff's claims are typical of the claims of the members of the Class, as Plaintiff and members of the Class sustained injury arising out of Defendant's wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

54. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained competent counsel. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

55. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I: BREACH OF FIDUCIARY DUTY

56. Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

57. The Assets in the Separate Account, together with any income, gains or losses credited to or charged against the Account, were to be held and managed by Defendant for the exclusive benefit of the Plan and its Participants.

58. Defendant received the administrative maintenance charges and Revenue Sharing Payments solely as a result of its exercise of its duties under the Contract in that, but for those duties, Defendant would not have had authority or control over the management or disposition of Plan assets and would not have been able to receive either the administrative maintenance charges or the Revenue Sharing Payments.

59. Since the mutual fund companies managed the investment in the mutual funds for the amount of the underlying mutual fund expenses paid minus the amount of the Revenue Sharing Payments, had Defendant properly exercised its duties, the expenses under the Contract charged against the Assets would have been reduced by the amount of the Revenue Sharing Payments.

60. By charging excessive fees and by retaining Revenue Sharing Payments for its own benefit, Defendant failed to perform its duties for the sole benefit of the Plan, in breach of its fiduciary duty of loyalty. To the contrary, Defendant has an apparent and actual conflict of interest in that it appears to have selected mutual fund options at least in part based on the amount of the Revenue Sharing Payments.

61. As a consequence of Defendant's breaches, the Plan suffered losses equal to the amount of the excessive charges and Revenue Sharing Payments together with any amounts that could have been earned thereon.

62. Defendant is liable to personally make good to the Plan any losses to the Plan resulting from each breach under 29 U.S.C. § 502(a)(2).

63. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief to the Class.

## COUNT II: PROHIBITED TRANSACTIONS

64. Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

65. ERISA § 406 (b)(1), 29 U.S.C. § 406 (b)(1), prohibits a fiduciary from dealing with assets of a plan for its own interest or account.

66. Defendant violated this provision in that it received assets of the Plan for its own interest through its receipt of the excessive charges and Revenue Sharing Payments.

67. ERISA § 406 (b)(3), 29 U.S.C. § 406 (b)(3), prohibits a fiduciary from receiving consideration from any party dealing with a plan in connection with a transaction involving assets of the plan.

68. Defendant violated this provision in that it received Revenue Sharing Payments from third parties dealing with the Plan concerning Plan investments and the payment of fees in connection therewith.

69. Defendant's receipt and retention of the excessive charges and Revenue Sharing Payments are transactions prohibited by ERISA.

70. Defendant is liable to personally make good to the Plan any losses to the Plan resulting from these prohibited transactions under 29 U.S.C. § 502(a)(2).

71. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief to the Class.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for:

A.   An Order determining that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing Plaintiff as class representative and determining that Plaintiff's counsel satisfies the prerequisites of Rule 23(g);

B.   A Declaratory Judgment that Defendant breached ERISA fiduciary duties owed to the Plan and Participants;

C.   An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendant's breaches of fiduciary duty and violations of ERISA;

D.   Imposition of a Constructive Trust on any amounts by which Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.   An Order for equitable restitution and disgorgement of any Plan assets Defendant obtained as a result of its breaches of fiduciary duty, including receipt of the excessive charges and Revenue Sharing Payments, and other appropriate equitable monetary relief against Defendants.

F.   An Order permitting the withdrawal of any and all amounts payable under the Contract without imposition of a surrender fee;

G.   An Order enjoining Defendants from any further violations of their ERISA fiduciary obligations;

H.   Actual damages paid to the Plan in the amount of any losses the Plan suffered;

I.   An Order allocating the Plan's recoveries to the accounts of all Participants;

J.   An Order awarding costs pursuant to 29 U.S.C. § 1132(g); and

K.     An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine.

**Plaintiff, John P. Charters**

By:     /s/ Michelle H. Blauner
Thomas G. Shapiro BBO #454680
Michelle H. Blauner BBO# 549049
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134

Robert A. Izard
Jeffrey S. Nobel
Mark P. Kindall
**SCHATZ NOBEL IZARD, P.C.**
20 Church Street, Suite 1700
Hartford, CT 06103
Telephone: (860) 493-6292
Facsimile:  (860) 493-6290

Ronen Sarraf
Joseph Gentile
**SARRAF GENTILE LLP**
485 Seventh Avenue, Suite 1005
New York, NY 10018
Telephone: (212) 868-3610
Facsimile: (212) 918-7967

**Attorneys for Plaintiff and the Class**