**United States District Court**
**District of Massachusetts**

```
_____
                                )
JOHN CHARTERS,                  )
         Plaintiff,             )
                                )
     v.                         )     Civil Action No.
                                )     07-11371-NMG
JOHN HANCOCK LIFE INSURANCE CO.,)
         Defendant.             )
                                )
                                )
                                )
_____)
```

**MEMORANDUM & ORDER**

**GORTON, J.**

The plaintiff, John P. Charters ("Charters") alleges violations of the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1002 et seq., ("ERISA") on behalf of the 401(k) plan for which he is a trustee and on behalf of all trustees and administrators of all "employment benefit plans" under ERISA that owned variable annuity contracts from the defendant, John Hancock Life Insurance Company ("Hancock"). Hancock has counterclaimed for indemnity, contribution and breach of fiduciary duty in response to which Charters has filed a motion to dismiss. Both parties have also filed cross-motions for summary judgment.

## I.   Background

### A.   Factual Background

Charters is the trustee of the Charters, Heck, O'Donnell &

Petrulis, P.C. 401(k) plan ("the Plan").  The Plan is a "defined contribution" or "individual account" plan which provides individual accounts for each participant and pays benefits to each participant based upon the amount of money in his or her account.  The amount of benefits received by participants depends on the amount of money invested, the performance of the accounts' investments and the fees charged by the companies who manage the money.

Charters, as trustee of the Plan, purchased an Accumulated Retirement Account Group Annuity Contract ("the Contract") from Hancock in April, 2005.  The Contract became effective on May 31, 2005, and was terminated on January 9, 2008.  Under the Contract, Hancock held and managed assets of the Plan ("the Assets") in an account maintained by Hancock that was segregated from Hancock's general funds ("the Separate Account").  The Contract required Hancock to invest the Assets and credit any income and gains from investment of the Assets (or charge any losses) to the Separate Account.

Hancock established and maintained a variety of investment options pursuant to the Contract, including a Guaranteed Interest Account and a variety of mutual fund investment options.  Hancock offered the mutual funds through "sub-accounts" that were established and maintained by Hancock as bookkeeping records to account for investment in the mutual funds.  Hancock maintained a

sub-account for each mutual fund offered under the Contract and allocated Assets in a participant's account to the particular sub-account that invests in the corresponding mutual fund. Hancock bought the shares of the mutual funds in its own name with its own assets in an amount equal to the value of the total amount pooled in the respective sub-account.  The Separate Account and participants' accounts did not actually own shares of the mutual fund.

Under the Contract, Hancock had the right to substitute alternative mutual funds, trusts or portfolios for the mutual funds it offered.  Charters was given advance notice of any proposed substitution through semi-annual mailings.  When Hancock exercised its right to substitute underlying funds, Charters retained the following options: (1) accept the proposed substitution, (2) move his investment from the affected sub-account to another sub-account offered under the Contract or (3) terminate the Contract.  Under the Contract, Charters was subject to administrative charges for transferring assets to another sub-account and termination fees for terminating the Contract.

As detailed in the Contract, Hancock charged a fixed participant fee and an asset charge based on the amount of the Assets held in the Separate Account.  Those charges compensated Hancock for performing record-keeping services.  Hancock also charged an annual investment charge for investments in each sub-

account.  That charge was comprised of the fee of the underlying
mutual fund and an "administrative maintenance charge" levied by
Hancock to reimburse it for administering and maintaining each
sub-account.  The administrative maintenance charge varied
between no charge at all and a maximum of 50 to 75 basis points
(0.5% to .75%) per dollar invested, depending on the sub-account.
The Contract did not disclose how the administrative maintenance
charge was calculated.  Hancock retained sole discretion to alter
the maximum administrative maintenance charge at any time upon
three-months prior written notice to Charters.  Charters alleges
that the only administration or maintenance Hancock performed
with respect to the sub-accounts was the purchasing of mutual
fund shares and that, consequently, the administrative
maintenance charge was excessive.

Hancock received revenue sharing payments from the
underlying mutual funds in which it had invested on Charters'
behalf in the form of "asset based distribution charges."  Those
payments are also known as "12b-1 fees" and "sub-transfer agency
fees."  The Contract provided that the annual administrative
maintenance charge could be reduced by the amount, if any, that
Hancock received in revenue sharing payments.  Charters alleges
that Hancock received revenue sharing payments in excess of the
amount by which it reduced the administrative maintenance fee or
in excess of the entire administrative maintenance fee authorized

by the Contract.

**B.  Procedural History**

On July 26, 2007, Charters filed a complaint against Hancock alleging breach of fiduciary duty (Count I) and prohibited transactions (Count II).  In Count I Charters alleges that Hancock was a fiduciary of the Plan and that by charging excessive fees and by retaining revenue sharing payments for its own benefit, Hancock breached its fiduciary duty.  In Count II Charters alleges that Hancock, as a fiduciary, engaged in transactions prohibited by ERISA.

At the same time, Charters filed his class action on behalf of all trustees, sponsors and administrators of all employment benefit plans that owned Hancock variable annuity contracts. Hancock moved to dismiss the case and, on December 21, 2007, this Court allowed that motion to the extent that Charters sought to represent plan sponsors, but otherwise denied it.

On January 11, 2008, Hancock answered the complaint and asserted three counterclaims: for contribution, for indemnity and for Charters' alleged breach of his fiduciary duties to the Plan. Hancock later withdrew its third counterclaim and Charters has moved to dismiss the first two.  That motion is opposed.

Hancock filed a motion for summary judgment on March 7, 2008, arguing that it is not an ERISA fiduciary and that, even if it were, it did not breach a fiduciary duty to Charters.  Shortly

thereafter, a scheduling conference was held at which this Court indicated that it would consider the pending motion for summary judgment but that it had a particular interest in knowing if there are genuine issues of material fact as to:

> 1) whether Charters knew of and approved all of the fees Hancock charged to the Plan,
>
> 2) whether all revenue sharing payments Hancock received from the mutual funds were applied to offset fees owed by the plan and
>
> 3) if such a genuine issue (or issues) exist, does that preclude Charters from demonstrating, as a matter of law, that Hancock breached its fiduciary duty?

Charters filed an opposition to Hancock's motion for summary judgment and his own cross-motion for partial summary judgment on June 30, 2008, contending that Hancock is a fiduciary as a matter of law.  Hancock has filed an opposition to Charters' cross-motion and a reply to Charters' opposition.  This memorandum and order address both Charters' motion to dismiss Hancock's counterclaims and the cross-motions for summary judgment.

## II. <u>Charters' Motion to Dismiss Counterclaims</u>

### A. Legal Standard

In order to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a counterclaim must contain factual allegations sufficient "to raise a right to relief above the speculative level." <u>Bell Atl. Corp.</u> v. <u>Twombly</u>, 127 S. Ct. 1955, 1965 (2007).  In considering the merits of a motion to dismiss, the court may look only to the facts alleged in the pleadings,

documents attached as exhibits or incorporated by reference in the counterclaim and matters of which judicial notice can be taken.  <u>Nollet</u> v. <u>Justices of the Trial Court of Mass.</u>, 83 F. Supp. 2d 204, 208 (D. Mass. 2000) <u>aff'd</u>, 248 F.3d 1127 (1st Cir. 2000).  Furthermore, the court must accept all factual allegations in the counterclaim as true and draw all reasonable inferences in the pleader's favor.  <u>Langadinos</u> v. <u>American Airlines, Inc.</u>, 199 F.3d 68, 69 (1st Cir. 2000).  If the facts in the counterclaim are sufficient to state a cause of action, a motion to dismiss it must be denied.  <u>See</u> <u>Nollet</u>, 83 F. Supp. 2d at 208.

   **B.   Analysis**

   Charters makes four arguments in its motion to dismiss Hancock's counterclaims: 1) claims for contribution and indemnification do not exist as a matter of law under ERISA, 2) even if they did exist, they should be dismissed in this case because Hancock received all of the allegedly improper fees and therefore has no rights against Charters, 3) the breach of fiduciary duty counterclaim does not allege that the Plan suffered any loss or that Charters acted improperly and 4) Hancock is asserting third-party claims pursuant to Fed. R. Civ. P. 14 but has failed to follow the prescribed procedure.  Because Hancock withdrew its counterclaim based on Charters's fiduciary status, the third argument is now moot.

In a supplemental brief, Charters also argues that, because he has since terminated his relationship with Hancock, it is no longer a fiduciary and thus lacks standing to bring claims for contribution and indemnification.  Because this Court agrees that claims for contribution and indemnification do not exist under ERISA, it is unnecessary to address Charters remaining arguments.

Neither the Supreme Court nor the First Circuit Court of Appeals has directly addressed the existence of a federal common-law right to contribution and indemnification under ERISA. Currently there is a split among the Circuit Courts of Appeal that have addressed the issue.  Compare Travelers Cas. & Sur. Co. of Am. v. IADA Servs., Inc., 497 F.3d 862, 867 (8th Cir. 2007) (holding that rights of contribution and indemnification do not exist under ERISA), and Kim v. Fujikawa, 871 F.2d 1427, 1431-32 (9th Cir. 1989) (same), with Chemung Canal Trust Co. v. Sovran Bank/Maryland, 939 F.2d 12, 18 (2d Cir. 1991) (holding that ERISA provides for claims of contribution and indemnification).[1]

The split in the circuits is indicative of the tension between the Supreme Court's assertions that 1) ERISA allows for

---

[1] Although the Court of Appeals for the Seventh Circuit has also indicated, in dictum, that indemnification and contribution are permissible under ERISA, see Alton Mem'l Hosp. v. Metro. Life Ins. Co., 656 F.2d 245, 250 (7th Cir. 1981), district courts within that circuit have declined to follow that decision on the ground that it is inconsistent with subsequent Supreme Court precedent. See Mut. Life Ins. Co. of N.Y. v. Yampol, 706 F. Supp. 596, 599-600 (N.D. Ill. 1989).

the development of federal common law but 2) federal courts
should be reluctant to imply rights of action not explicitly
provided for in the text of the statue.  Compare Firestone Tire &
Rubber Co. v. Bruch, 489 U.S. 101, 110 (1989) ("courts are to
develop a federal common law of rights and obligations under
ERISA-regulated plans" (citation and internal quotation marks
omitted)), with Great-West Life & Annuity Ins. Co. v. Knudson,
534 U.S. 204, 209 (2002) (noting that the Court is "especially
reluctant to tamper with the enforcement scheme embodied in the
statute by extending remedies not specifically authorized by its
text" (citation and internal quotation marks omitted)).

Hancock contends that this Court should follow the lead of
the Second Circuit Court of Appeals in Chemung Canal Trust Co. v.
Sovran Bank/Maryland and find that ERISA authorizes claims for
contribution and indemnification.  See 939 F.2d at 18.  In
Chemung Canal, the Second Circuit justified its decision by
explaining that it was not creating a "right of action" because
contribution is merely "a procedural device for equitably
distributing responsibility."  Id. at 15; see also Haddock v.
Nationwide Fin. Servs. Inc., No. 01-1552, 2008 WL 3288248, at *5
(D. Conn. 2008).  Several district courts, in this circuit and
others, have adhered to the reasoning of Chemung Canal.  See
Duncan v. Santanielio, 900 F. Supp. 547, 552 (D. Mass. 1995)
(relying "heavily" on Chemung Canal); see also, Site-Blauvelt

Engrs., Inc. v. First Union Corp., 153 F. Supp. 2d 707, 709 (E.D.
Pa. 2001) (relying on Chemung Canal); Cooper v. Kossan, 993 F.
Supp. 375 (E.D. Va. 1998) (same); Maher v. Strachan Shipping Co.,
817 F. Supp. 43, 44 (E.D. La. 1993) (same); Jones v. Trevor,
Stewart, Burton & Jacobsen, Inc., No. 90-0420, 1992 WL 252137, at
*4 (N.D. Ga. 1992) (same).

     Although Chemung Canal remains good law, subsequent Supreme
Court decisions have emphasized the reluctance with which courts
should imply statutory remedies not authorized by the text of
ERISA.  See Knudson, 534 U.S. at 209; Mertens v. Hewitt Assocs.,
508 U.S. 248, 251 (1993).  In 2001, in Great-West Life & Annuity
Insurance Co. v. Knudson, the Court explained that

     ERISA is a comprehensive and reticulated statute, the
     product of a decade of congressional study of the
     Nation's private employee benefit system. . . . We have
     therefore been especially reluctant to tamper with the
     enforcement scheme embodied in the statute by extending
     remedies not specifically authorized by its text.

 534 U.S. at 209 (citation and internal quotation marks omitted).

     A more recent circuit court decision recognizes that
subsequent Supreme Court statements have cast doubt on the
holding of Chemung Canal.  In 2007, in Travelers Casualty &
Surety Co. of America v. IADA Services Inc., the Eighth Circuit
Court of Appeals noted that:

     Since the Second Circuit's decision in Chemung Canal
     . . . the Supreme Court has reiterated more than once
     its admonition that notwithstanding the authority to
     fashion certain rules of federal common law under
     ERISA, the statute's "carefully crafted and detailed

                              -10-

> enforcement scheme provides strong evidence that
> Congress did <u>not</u> intend to authorize other remedies
> that it simply forgot to incorporate expressly."

497 F.3d at 866 (quoting <u>Knudson</u>, 534 U.S. at 209).  The Eighth

Circuit went on to explain that it was not convinced that

Congress inadvertently omitted a right of contribution from

ERISA's remedial scheme.  <u>Id.</u>  Noting that the decision of

whether or not to provide for such a remedy is a policy judgment

best suited for the legislative process, the court refused to

find an implied right of contribution under ERISA.  <u>Id.</u> (citation

omitted).  Numerous district courts have also elected not to

follow <u>Chemung Canal</u>.  <u>See, e.g.</u>, <u>Williams</u> v. <u>Provident Inv.</u>

<u>Counsel, Inc.</u>, 279 F. Supp. 2d 894, 900 (N.D. Ohio 2003); <u>Int'l</u>

<u>Bhd. of Painters & Allied Trades Union & Indus. Pension Fund</u> v.

<u>Duval</u>, No. 92-1099, 1994 WL 903314, at *3 (D.D.C. 1994).

      This Court finds the reasoning of <u>Travelers</u> to be

persuasive.  Holding that ERISA does not permit claims for

contribution and indemnification is consistent with Supreme Court

and First Circuit precedent, both of which caution against

finding implied remedies under the statue.  <u>See, e.g.</u>, <u>Knudson</u>,

534 U.S. at 209; <u>State St. Bank & Trust Co.</u> v. <u>Denman Tire Corp.</u>,

240 F.3d 83, 89 (1st Cir. 2001) ("courts are careful not to allow

federal common law to rewrite ERISA's carefully crafted statutory

scheme").  According to the First Circuit,

> federal common law will only give rise to a claim
> pursuant to ERISA in the limited class of cases "where

the issue in dispute is of central concern to the
federal statute."

Denman Tire, 420 F.3d at 89 (quoting Provident Life & Accident
Ins. Co. v. Waller, 906 F.2d 985, 990 (4th Cir. 1990)).  This
case does not fall within that limited class of cases.

Here neither party disputes that ERISA does not explicitly
provide for claims of contribution and indemnification among co-
fiduciaries.  Allowing fiduciaries who have breached their duty
to resort to contribution and indemnification to recover from co-
fiduciaries is not "of central concern" to ERISA.  See Denman
Tire, 240 F.3d at 89.  The purpose of ERISA is to "protect the
rights of employees in their benefit plans."  Schikore v.
BankAmerica Supplemental Retirement Plan, 269 F.3d 956, 962 (9th
Cir. 2001) (citing Congressional Findings and Declaration of
Policy, 29 U.S.C. § 1001(b)).  Allowing fiduciaries to spread
their liability protects fiduciaries, not employees or plan
participants, and is therefore not of central concern to ERISA.

Hancock contends that 1) contribution and indemnification
ensure that all fiduciaries are held accountable for their
actions and thus constitute deterrent and 2) deterring breaches
of fiduciary duty is a central concern of ERISA.  There is not,
however, universal agreement with respect to whether rights of
contribution and indemnification serve as a deterrent or actually
have the opposite effect.  See Travelers, 497 F.3d at 867.  The
lack of any explicit reference to contribution or indemnification

in the text of ERISA belies the assertion that holding all co-
fiduciaries accountable was of central concern to the drafters of
the statute.

Because this Court finds that ERISA does not allow for an
implied right of contribution or indemnification, Hancock's
counterclaims will be dismissed.

**III. <u>Cross-Motions for Summary Judgment</u>**

**A.    Summary Judgment Standard**

The role of summary judgment is "to pierce the pleadings and
to assess the proof in order to see whether there is a genuine
need for trial." <u>Mesnick</u> v. <u>General Elec. Co.</u>, 950 F.2d 816, 822
(1st Cir. 1991) (quoting <u>Garside</u> v. <u>Osco Drug, Inc.</u>, 895 F.2d 46,
50 (1st Cir. 1990)).  The burden is upon the moving party to
show, based upon the pleadings, discovery and affidavits, "that
there is no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law."  Fed.
R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the
suit under the governing law." <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>,
477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant
or unnecessary will not be counted." <u>Id.</u>  A genuine issue of
material fact exists where the evidence with respect to the
material fact in dispute "is such that a reasonable jury could
return a verdict for the nonmoving party." <u>Id.</u>

Once the moving party has satisfied its burden, the burden
shifts to the non-moving party to set forth specific facts
showing that there is a genuine, triable issue.  <u>Celotex Corp.</u> v.
<u>Catrett</u>, 477 U.S. 317, 324 (1986).  The Court must view the
entire record in the light most hospitable to the non-moving
party and indulge all reasonable inferences in that party's
favor.  <u>O'Connor</u> v. <u>Steeves</u>, 994 F.2d 905, 907 (1st Cir. 1993).
If, after viewing the record in the non-moving party's favor, the
Court determines that no genuine issue of material fact exists
and the moving party is entitled to judgment as a matter of law,
summary judgment is appropriate.

**B.  Analysis**

Hancock makes two substantive arguments in its motion for
summary judgment. First, it contends that it was not an ERISA
fiduciary with respect to the Plan and second, in the
alternative, it did not breach any fiduciary duty even if it had
one.  In his cross-motion for partial summary judgment, Charters
argues that Hancock was an ERISA fiduciary with respect to the
Plan.

**1.  Hancock as a Fiduciary**

Claims for breach of fiduciary duty and prohibited
transactions under ERISA §§ 404 and 406(b) may only be asserted
against a party that is a fiduciary within the meaning of ERISA.
<u>Mertens</u> v. <u>Hewitt Associates</u>, 508 U.S. 248, 252-53 (1993).  Under

-14-

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), a person is a
fiduciary "[t]o the extent . . . he . . . exercises any authority
or control respecting management or disposition of [plan]
assets." The First Circuit Court of Appeals has indicated that
"the mere exercise of physical control or the performance of
mechanical administrative tasks generally is insufficient to
confer fiduciary status." Beddall v. State St. Bank and Trust
Co., 137 F.3d 12, 18 (1st Cir. 1998). Under First Circuit
precedent, the exercise of discretion is a necessary element to
give rise to fiduciary duty under ERISA. Cottrill v. Sparrow,
Johnson & Ursillo, Inc., 74 F.3d 20, 22 (1st Cir. 1996).

Hancock argues that it was not a fiduciary because it did
not exercise authority or control over the management or
disposition of the Plan's assets. According to Hancock, the
Contract generally conferred upon Charters all discretionary
authority. He refutes that contention and responds that Hancock
was an ERISA fiduciary because it 1) offered variable annuity
contracts that held plan assets in separate accounts, 2)
exercised authority or control over management or disposition of
plan assets and 3) retained discretion to substitute investment
options.

### a. Hancock's Holding of Assets in a Separate Account

Charters argues that Hancock is an ERISA fiduciary because
it sold variable annuity contracts that held the Plan assets in

separate accounts and by which the Plan participants bore the investment risk.  In support of that argument Charters cites to Department of Labor ("DOL") regulations and legislative history that suggests insurance companies are subject to ERISA's fiduciary responsibilities with respect to assets held in separate accounts. <u>See, e.g.,</u> 29 C.F.R. § 2550.401c-1(d)(2)(c) (2008); H.R. Rep. No. 93-1280, at 296-97 (1974) (Conf. Rep.). Hancock responds that those authorities should not be read to suggest that an insurer acts as a fiduciary solely because it holds assets in a separate account if it does not also exercise the requisite discretionary authority or control over those assets.

Given the First Circuit's emphasis on discretion as the touchstone of fiduciary status, <u>see</u> <u>Beddall</u>, 137 F.3d at 18; <u>Cottrill</u>, 74 F.3d at 22, it is unlikely that Hancock's issuance of variable annuity contracts and the retention of assets in a separate account is alone sufficient to confer fiduciary status. Because it is unnecessary, in light of the issues discussed hereinafter, to decide whether issuing variable annuity contracts would alone be sufficient, the Court demurs on that question.

**b.    Hancock's Exercise of Authority or Control over Management or Disposition of Plan Assets**

Charters also asserts that Hancock acquired ERISA fiduciary status by virtue of its exercise of authority or control over the management or disposition of plan assets.  Charters contends,

-16-

inter alia, that under the Contract Hancock retained discretion to set its own compensation but Hancock responds that it does not exercise discretion over its compensation by receiving fees at contractually agreed upon rates.

Although apparently the First Circuit has not addressed the issue, other courts have held that insurance companies are not fiduciaries with respect to their fees if they lack any authority to affect the timing or amount of their compensation. <u>See, e.g.,</u> <u>Schulist</u> v. <u>Blue Cross of Iowa</u>, 717 F.2d 1127, 1131-32 (7th Cir. 1983).  In an arms length transaction, an insurance company negotiating with a plan has no responsibility to the plan and no authority or control over whether the plan chooses to enter into the agreement.  <u>See</u> <u>F.H. Krear & Co.</u> v. <u>Nineteen Named Trs.</u>, 810 F.2d 1250, 1259 (2d Cir. 1987).  Accordingly, such a company has no fiduciary status with respect to its contractually agreed upon compensation.

If, on the other hand, an agreement gives an insurance company control over factors that determine the amount of its compensation, that company becomes an ERISA fiduciary with respect to its compensation.  <u>Id.</u>; <u>see also</u>, <u>Seaway Food Town,</u> <u>Inc.</u> v. <u>Med. Mut. of Ohio</u>, 347 F.3d 610, 619 (6th Cir. 2003); <u>Ed</u> <u>Miniat, Inc.</u> v. <u>Globe Life Ins. Group, Inc.</u>, 805 F.2d 732, 737 (7th Cir. 1986) ("When a contract . . . grants an insurer discretionary authority  . . . the insurer may be a fiduciary.").

Hancock is a fiduciary because the Contract gave it discretionary authority to determine the amount of its compensation.  Under the terms of the Contract, Hancock had the sole authority to set the administrative maintenance charge, limited only by a maximum charge for each sub-account.  The Contract did not disclose how the administrative maintenance charge was calculated by Hancock.  Because the Contract gave Hancock discretionary authority over its fees it acquired a fiduciary status with respect to those fees.  <u>See</u> <u>Seaway Food Town, Inc.</u>, 347 F.3d at 619; <u>F.H. Krear & Co.</u>, 810 F.2d at 1259; <u>Ed Miniat, Inc.</u>, 805 F.2d at 737.

Hancock protests that, by setting the administrative maintenance charge, it exercised no discretion but rather only waived portions of the agreed-upon fee to which it was contractually entitled.  Regardless of whether Hancock's right to the maximum administrative maintenance charge was unqualified, it is undisputed that Hancock retained sole discretion to change the maximum administrative maintenance charge at any time upon three-months prior written notice to Charters.  That discretion was sufficient to make Hancock an ERISA fiduciary with respect to its fees.  The fact that Hancock may have exercised its discretion by charging less than what it could have is irrelevant to the determination of Hancock's fiduciary status.

Charters also claims that Hancock exercised authority or

-18-

control over the management or disposition of plan assets by 1)
owning plan assets, 2) allocating assets to various "classes"
within each sub-account with different fee structures, 3)
selecting the platform of investments offered to the Plan and 4)
charging other allegedly undisclosed fees to the Plan.  The Court
finds some of these arguments well-founded but, because Hancock's
discretion in setting the administrative maintenance charge is
sufficient to confer fiduciary status, it need not decide them as
a matter of law.

### c.  Hancock's Right to Substitute Investment Options

Charters also suggests that Hancock is a fiduciary because
of its right to substitute investment options made available to
the Plan.  Hancock responds that such a right did not make it a
fiduciary because Charters had the opportunity to reject any
proposed change.

The DOL has provided some guidance on whether a right to
substitute investment options confers fiduciary status on an
insurance company.  In a 1997 advisory letter to Frost National
Bank ("Frost"), the DOL stated that a bank serving as trustee of
ERISA plans may have discretionary authority or control over plan
assets if it has the right to add or remove "families" of mutual
funds that it makes available to plans.  DOL Op. 97-15A, 1997 WL
277980, at *3 (May 22, 1997).

A second DOL advisory letter issued that same day to Aetna

Insurance Company, Inc. ("Aetna") provides further guidance. <u>See</u> DOL Op. 97-16A, 1997 WL 277979, at *5 (May 22, 1997).  In the Aetna letter, the DOL explained that if a company provides ministerial services to a plan and retains the right to delete or substitute available investments, that company is not a fiduciary so long as the plan fiduciary makes the decision to accept or reject the change.  <u>Id.</u> at *5.

    In this case it is undisputed that, under the Contract, 1) Hancock had "the right to substitute shares of another mutual fund, trust or portfolio thereof with similar investment objectives for each Sub-account," 2) Charters was informed of Hancock's proposed substitutions and 3) Charters' had choices upon learning of a substitution.  With respect to the last point, Charters could a) accept the proposed substitution, b) move his investment from the affected sub-account to another sub-account offered under the Contract or c) terminate the Contract.[2]

    Hancock contends that Charters' options in the event of a substitution fell squarely within the facts of the Aetna letter and therefore Hancock's right of substitution was insufficient to confer fiduciary status.  Charters' ability to reject Hancock's

---

[2] Hancock identifies as an additional choice that Charters could have removed the affected sub-account as an investment option but the practical effect of pursuing such an option is unclear.  In any event, whether such an option presents a distinct alternative from option b) is irrelevant to the question of whether Hancock was a fiduciary.

substitutions was, however, more limited than the arrangement
considered by the DOL in the Aetna letter.  If Charters sought to
reject a substitution and maintain his investment in the replaced
fund, his only option was to terminate the Contract and select a
different service provider offering that fund.  In exercising
that right, Charters would be subject to a termination fee of up
to 2% of the assets invested with Hancock by the Plan.  Cf. DOL
Op. 97-16A, 1997 WL 277979, at *2, 5 (May 22, 1997) (plan
fiduciaries could terminate the arrangement without penalty).
Charters would also be subject to administrative charges for
transferring assets to another sub-account.

Because of the built-in penalties, Charters did not have a
meaningful opportunity to reject substitutions.  Cf. id. at *5.
Accordingly, this Court finds that Hancock's ability to
substitute investment options also rendered it a fiduciary of the
Plan.  See Haddock v. Nationwide Fin. Servs., 419 F. Supp. 2d
156, 166 (D. Conn. 2006) (holding that insurance company may be a
fiduciary by determining and altering the investment options
available to a plan).

### 2.   Did Hancock Breach Its Fiduciary Duty?

As an alternative ground for entering summary judgment in
its favor, Hancock argues that even if it was an ERISA fiduciary,
it breached no fiduciary duty to the Plan.  Hancock asserts that
all fees were fully disclosed to Charters and therefore they

-21-

cannot be excessive as a matter of law.  Hancock also contends that all revenue sharing payments that Hancock received from mutual funds were applied to offset fees owed by the plan.

### a.  Excessive Fees

Hancock contends that its fees were not excessive as a matter of law because they were fully disclosed to Charters in the Contract.  Charters responds that Hancock's fees were not fully disclosed in that the Contract described only the maximum administrative maintenance charge but not how that charge was to be calculated.

Courts in other circuits have held that an insurance company cannot be held liable for breach of a fiduciary duty for receiving agreed upon fees.  See, e.g., Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc., 474 F.2d 463, 475-76 (7th Cir. 2007); Seaway, 347 F.3d at 618-19; Harris Trust and Savs. Bank v. John Hancock Mut. Life Ins. Co., 302 F.3d 18, 29 (2d Cir. 2002); Schulist, 717 F.2d at 1130-32. In each of those cases, however,  the insurance companies exercised no discretionary authority with respect to their fees. See, e.g., Harris Trust, 302 F.3d at 29 ("[A]dherence to [contract terms] . . . cannot constitute a breach of . . . fiduciary duties, barring a grant of discretionary authority.").

As explained above, Hancock did exercise discretion over the amount of its compensation by unilaterally setting the

administrative maintenance charge.  It has indicated that the administrative maintenance charge was for "administrative costs of maintaining the sub-accounts," but the Contract did not disclose how the charge would be calculated.  Although the maximum administrative maintenance charge was disclosed, the record contains no evidence that Charters agreed to be charged the maximum regardless of the amount of work Hancock performed in maintaining the sub-accounts.  Therefore, Hancock has not demonstrated that the administrative maintenance charges that were actually assessed were fully disclosed in the Contract and agreed to by Charters.  Accordingly, summary judgment in Hancock's favor with respect to excessive fees is not appropriate at this stage.

### b. Revenue Sharing Payments

Hancock also seeks summary judgment on the ground that Charters, and not Hancock, enjoyed the full benefit of any revenue sharing payments paid to Charters by the underlying mutual funds in which Hancock invested on behalf of the Plan. Charters alleges that Hancock received revenue sharing payments in excess of the amount by which it reduced the administrative maintenance fee or in excess of the entire administrative maintenance fee authorized by the Contract.

In support of its motion, Hancock points to the Frost advisory letter in which the DOL directly addressed the issue of

plan fiduciaries receiving fees from the mutual funds in which
they invest.  DOL Op. 97-15A, 1997 WL 277980, at *4 (May 22,
1997).  The DOL expressed the opinion that such fees are not a
breach of fiduciary duty provided they are used solely to benefit
the plans themselves, either as a dollar-for-dollar offset
against the fees the plans would otherwise be obligated to pay or
as amounts credited directly to the plans.  Id.

Hancock does not dispute that it received revenue sharing
payments in the form of 12b-1 and sub-transfer agency fees from
the funds in which it invested on the Plan's behalf.  Hancock
asserts, however, that the Plan enjoyed the full benefit of those
payments.  Despite such assertions, the evidence in the record is
insufficient to establish that no genuine issue of material fact
exists with respect to whether all revenue sharing payments were
applied to offset fees owed by the plan.

Hancock's statement that it "applied such fees to reduce the
administrative maintenance charge" falls short of demonstrating
that revenue sharing payments were used to offset Plan fees on a
dollar-for-dollar basis.  See id.  Furthermore, Hancock's
proffered evidence (in the form of a chart submitted as an
exhibit), that the revenue sharing payments plus the
administrative maintenance charge assessed to the Plan never
exceeded the maximum administrative maintenance charge allowed,
does not demonstrate that all revenue sharing payments were

-24-

applied to reduce fees owed by Charters.  A reasonable jury could conclude that some of the revenue sharing payments received by Hancock were not applied to offset fees owed by Charters and that therefore Hancock improperly benefitted from its role as a fiduciary.  Because Hancock has not satisfied its burden of showing that <u>all</u> revenue sharing payments were used to offset fees owed by the Plan, summary judgment is not appropriate.


### ORDER

In accordance with the foregoing, the plaintiff's motion to dismiss defendant's counterclaims (Docket No. 24) is **ALLOWED**. Hancock's motion for summary judgment (Docket No. 31) is **DENIED** and Charters cross-motion for partial summary judgment (Docket No. 48) is **ALLOWED**.


**So ordered.**

                              /s/ Nathaniel M. Gorton
                              Nathaniel M. Gorton
                              United States District Judge
Dated September 30, 2008